[Cite as *State v. Stidhum*, 2018-Ohio-4616.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                             :          APPEAL NO. C-170319
                                                      TRIAL NO. B-1506895
    Plaintiff-Appellee,           :

 vs.                                       :
                                                      *O P I N I O N.*
THOMAS CAVEZ STIDHUM,                      :

    Defendant-Appellant.          :


Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  November 16, 2018


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Sarah E. Nelson*, Assistant Public Defender, for Defendant-Appellant.

**ZAYAS, Judge.**

{¶1} Following a jury trial, defendant-appellant Thomas Cavez Stidhum was found guilty of aggravated vehicular homicide, vehicular homicide, failure to stop after an accident, and tampering with evidence for recklessly speeding down Dorchester Avenue, while his driver's license was suspended, striking and killing a jogger with his car, removing the license plate from the vehicle, and fleeing the scene on foot. The trial court imposed an aggregate sentence of 14 years' imprisonment, a $15,000 fine, a license suspension of three years to life, and court costs.

{¶2} In seven assignments of error, Stidhum argues that the trial court erred by admitting in-court identifications, his counsel rendered ineffective assistance, the destruction of recorded statements denied him his right to present a defense and confront witnesses, the trial court erred in denying a mistrial, the trial court erred in admitting prior bad-acts evidence, the cumulative effect of the errors denied him his right to a fair trial, and the trial court erred in imposing a $15,000 fine. Finding no merit to his arguments, we affirm the trial court's judgment.

### Background Facts

{¶3} On December 12, 2015, Stidhum was charged by a sealed, direct indictment with aggravated vehicular homicide, vehicular homicide, tampering with evidence, and failure to stop after an accident. He was arrested on January 8, 2016. He filed a discovery demand that included a request for any statements that might impeach the state's witnesses and any statements indicating Stidhum did not commit the offenses. The state provided the requested discovery, and the case was scheduled for a jury trial.

{¶4} Prior to trial, the state notified Stidhum that one of its eyewitnesses, Holly Crawford, would identify Stidhum at trial as the driver. Holly Crawford was initially

2

interviewed on the day of the accident by Specialist Gregory Toyeas, a trained crash reconstruction officer in the Traffic Safety Unit of the Cincinnati Police Department. The written summary of Crawford's interview did not indicate that she was able to identify Stidhum. The summary also indicated that her statement had been taped. However, the recording of her statement was not provided to Stidhum, and the state could not locate the recording.

### The Motion to Dismiss and the Motion to Suppress

{¶5}    Stidhum filed a motion to dismiss the indictment based upon the state's failure to preserve the recorded witness statement of Crawford, and a motion to suppress her identification testimony. Stidhum argued that the recorded statement was materially exculpatory or, in the alternative, the recorded statement was potentially useful and the police acted in bad faith by deleting the recording.

{¶6}    At the hearing on the motions, Toyeas testified that he had interviewed and recorded nine witness statements on a hand-held recording device on the day of the accident. Six days later, he prepared written summaries of the statements that contained all of the pertinent information in the recorded statements. He downloaded the statements onto a disc that he provided to the prosecutor, and he believed that he had also uploaded the recordings to the computer server. When he learned the recordings were missing, Toyeas requested an IT department employee, Justin Meek, to try to locate the files on the server and on the hand-held recorder. Meek, a former Cincinnati Police Department senior computer programmer analyst, testified that he was not able to locate the files. Meek also testified that nothing in his investigation indicated the missing files were intentionally deleted.

{¶7}    The trial court determined that the recording was not materially exculpatory because the pertinent information was contained in the witness summary,

and that the recording was potentially useful. Because it was potentially useful, Stidhum was required to prove that the state acted in bad faith in failing to preserve the recording. The trial court overruled both motions after finding that Stidhum did not offer any evidence of bad faith.

### The Hearing on the Notice of Intent

{¶8}   The state filed a notice of intent to introduce evidence of other crimes, wrongs, or acts under Evid.R. 404(B). The state sought to introduce evidence that, 15 days before the accident, Stidhum had recklessly operated a vehicle at a high rate of speed, lost control of the vehicle, and struck another vehicle. Stidhum had then fled on foot and was ultimately apprehended after a law enforcement officer deployed a Taser. Stidhum was charged with leaving the scene of an accident, obstructing official business, and operating a vehicle while impaired ("OVI").

{¶9}   Prior to voir dire, the court heard arguments on the admissibility of the evidence. The state argued that the evidence was admissible to prove identity as a behavioral fingerprint. In both cases, Stidhum drove recklessly, lost control of his car, was involved in an accident, fled the scene, and was apprehended after the use of a Taser by a law enforcement officer. Stidhum objected to the admissibility of the evidence that he had been convicted of driving impaired because it was highly prejudicial and irrelevant to the current charges.

{¶10} The court took the matter under advisement, and heard additional arguments prior to the testimony. The trial court ultimately ruled that the state could introduce evidence of the prior accident and the fleeing, but the testimony about the use of a Taser and the OVI evidence was inadmissible.

### The Jury Trial

{¶11} The case proceeded to a jury trial, where the following facts were

established. On the morning of December 6, 2015, Catherine Chatfield was running the Seven Hills Run with two members of her running group, Holly Crawford and Mary Luebbers. As the three were running up the hill on Dorchester Avenue, Stidhum lost control of his vehicle, hit a pole, jumped a curb, and struck and killed Chatfield, who was running on the sidewalk.

{¶12} Luebbers, who was running in front of Chatfield and Crawford, heard the crash and called 911. While on the phone with dispatch, she saw a young, slender black male with short hair, remove a license plate from the car and run down the street. Then, she saw him return to the car and enter the back seat of the car. Within an hour of the accident, she spoke with Toyeas and told him she could not identify the driver. She was not shown a photo lineup.

{¶13} During her testimony, Luebbers identified Stidhum as the man who removed the license plate and ran from the car with 100 percent certainty. She had looked at his face for a few seconds at a distance of 15 feet. During cross-examination, she admitted that her identification was based solely on the fact that he was arrested and not on her memory. She explained that she was so focused on her friend that she did not see or remember the event very clearly. Luebbers acknowledged that she had gone to every court proceeding, and she did not recognize Stidhum when she saw him at the first hearing. After questioning by the trial court, Luebbers further explained that her identification of Stidhum was based on her belief that the police had arrested the correct person.

{¶14} Crawford, who was running behind Luebbers but in front of Chatfield, heard the crash and saw Chatfield after she was struck and lying on the sidewalk. After the car stopped, both the driver and the female passenger exited from the car. Stidhum walked toward Crawford, and she asked him for help because Chatfield was bleeding.

She was six feet away from him and got a clear look at his face. Stidhum ran to the front of the car, and a few moments later, Crawford saw him pulling out a backpack and some papers from the back seat of the car. He and the passenger started running down the hill, but the passenger turned around and came back to the scene of the accident. Stidhum also briefly returned, went to the driver's side of the car, and fled. She again saw his face when he returned to the car.

{¶15} Crawford stayed at the scene, and was interviewed by Toyeas. She testified that she did not tell Toyeas that she could not identify the driver, but admitted that she did not remember all of the questions that he asked her. The police did not show her a lineup. Crawford stated that no one had ever asked her if she could identify Stidhum until the prosecutor was preparing for trial. During the trial, she identified Stidhum, with 100 percent certainty, as the man she saw getting out of the car after the accident.

{¶16} On cross-examination, she conceded that she had not told anyone she could identify Stidhum until ten months after the accident. She further admitted that she had seen Stidhum at the arraignment and in several court proceedings.

{¶17} Cynthia Weber also participated in the run. She was approaching Dorchester Avenue when she saw a young, medium-complected black male running toward her at a high rate of speed. He was three-to-four feet from her when he passed her on the sidewalk. She looked at him and noticed that he was a good-looking young man with short hair and a clean-shaven, full face. She thought that he was in good shape, and that he should join their running group because he was a strong runner.

{¶18} Once she ran up the hill, she saw the accident and knew that Chatfield had died. She watched as the EMT's placed her in the ambulance, and she ran to the hospital with some of the other runners. She was interviewed by a police officer at the

6

hospital.

{¶19}  Later that afternoon, a police officer called her and asked her to come to the police station to look at a photo lineup.  Weber looked at six photographs, and believed that three of the six looked like the man she saw running.  One of those three was Stidhum, but she could not determine with 100 percent certainty which of the three she saw.  Weber testified that she told the police officer that she could narrow it down to three, but the officer's notes stated that she was very upset, and could not identify the person she saw running.  Weber believed the officer had confused her with another witness who was upset.  She identified Stidhum in court, and testified that she was 80 percent certain that he was the man she saw running past her.

{¶20}  Two other runners, John Homer and Scott Covill, were running up the hill after the accident.  Covill could not identify the man he saw running down the hill. Homer got a good look at the man's face when their paths crossed on the sidewalk. Homer nodded at him and greeted him, but Stidhum did not respond.  Later that afternoon, Homer chose Stidhum's photo from a photo lineup.  Homer identified Stidhum in court.

{¶21}  Toyeas responded to the scene to investigate the crash.  When he arrived, the first responding officers had separated the witnesses.  Toyeas interviewed six runners, three residents, and the passenger in the car, Mariah Johnson.  When he learned that the driver had run down the hill with a backpack and papers, he and evidence technician Pat Moran canvassed the scene and the street.  They collected the license plate and the bracket that were found in front of the car.  While walking down the street, they found numerous papers that appeared to be a child's school papers and a piece of paper with a blood stain.  The papers were sent to the Hamilton County Coroner's Lab for testing.  Toyeas also sent two swabs from a Sunkist soft drink can

located in the car, swabs from the steering wheel and ignition switch, and a swab from a Taurus pistol to the lab.

{¶22} After processing the scene, Toyeas went to his office and ran the license plate number through "their record management system" and the Regional Crime Information Computer. The car was registered to Kathryn Barwick, and Stidhum had been cited for a traffic violation while driving the car. Toyeas also learned that the school papers belonged to Barwick's daughter, and that Stidhum was Barwick's boyfriend. Toyeas testified that he discovered that Barwick had filed a domestic-violence complaint, but before he mentioned whom the charge was filed against, Stidhum objected. The trial court sustained the objection and ordered the testimony stricken. The court immediately instructed the jurors to disregard the testimony.

{¶23} Toyeas prepared a photo lineup that included a picture of Stidhum. He showed the lineup to five of the ten witnesses. According to Toyeas, Weber was very upset that she could not identify the person she saw running away, and Homer identified Stidhum as the man he saw running past him. Over objection, Toyeas testified that Johnson, the passenger, identified Stidhum as the driver. When Stidhum renewed his objection, the trial court sustained the objection and reminded Toyeas that he could not discuss what other witnesses told him.

{¶24} Stidhum asked Toyeas why he did not show the lineup to all of the eyewitnesses. When Toyeas again mentioned Johnson, Stidhum objected. The court allowed Toyeas to finish his response, and he stated that Johnson identified Stidhum as the driver with 100 percent confidence. Upon further cross-examination, Toyeas acknowledged that Johnson had retracted that identification.

{¶25} Barwick testified that she had purchased the car involved in the accident. The last time she had seen the car was on December 5, 2015, the day before the accident.

Stidhum had driven her to work that morning, dropped her off, and drove away in the car.

{¶26} Tracy Sundermeier, a serologist and DNA analyst conducted DNA testing on the items submitted by Toyeas. She testified that the license plate and license plate frame contained an insufficient amount of DNA to test. Stidhum was the source of the DNA profile obtained from the Sunkist can and the blood stain. Sundermeier could not exclude Stidhum from the DNA profile obtained from the steering wheel and the ignition switch swabs. She further explained that the portion of the population that could not be excluded was one in 7,424 individuals. The swab from the gun contained DNA from one major and two minor contributors. Sundermeier excluded Chatfield and Stidhum as the major contributor.

{¶27} Officer Steve Peponis, who was an investigator for the Cincinnati Fugitive Apprehension Squad at the time of the offense, was assigned to locate and arrest Stidhum in December 2015. Peponis initially testified that Stidhum had been evasive for about a year, but then clarified that he arrested Stidhum on January 8, 2016, less than 30 days after the accident. During cross-examination, he testified that he had previously arrested Stidhum for drug trafficking. When counsel objected, the trial court instructed the jurors to disregard the testimony. Stidhum moved for a mistrial, which was denied. Peponis later stated that he had had multiple investigations involving Stidhum, and the trial court admonished him again. Counsel did not renew the request for a mistrial.

{¶28} Peponis was the last witness to testify for the day. After his testimony, the trial court again instructed the jurors and told them that "on at least two occasions, I believe, you have been instructed to disregard a remark, that is extremely important. That is a matter of law. You are to disregard a remark." Then, the jurors were

9

discharged for the day.

{¶29} Officer William Summe, a patrol officer for the Springfield Township Police Department, testified that he was patrolling on Ronald Reagan Highway at 9 a.m. on November 21, 2015. Summe was monitoring traffic with a radar. A red Camaro drove past him traveling at a speed of 96 m.p.h. Summe pulled out and activated his lights and siren, and the car sped up. When Summe's speed reached 110 m.p.h., he slowed down and stopped his pursuit.

{¶30} Summe exited from the highway onto the Hamilton Avenue exit ramp. At the end of the ramp, he saw that the Camaro had crashed into a Chevy Avalanche. Summe learned that the driver of the Camaro was a young, black male dressed in red, who had fled the scene. Summe called for other units to search for the driver.

{¶31} Officer Allen Fath, a patrol officer for the Mount Healthy Police Department, pursued the suspect and ordered him to stop. When the driver failed to stop, Fath unsuccessfully attempted to use his Taser. Eventually, the driver stopped running when confronted by two other officers and was apprehended. Fath identified the driver as Stidhum.

{¶32} The state rested, and Stidhum moved for an acquittal pursuant to Crim.R. 29. After the trial court overruled the motion, the defense rested.

{¶33} The trial court instructed the jury on the credibility of the identifications and covered such issues as the witness's degree of attention when observing the offender, the accuracy of a prior description by the witness, surrounding circumstances under which the witness identified the offender, and the interval of time between the event and the identification. The court also instructed the jurors on the proper use of the other-acts evidence.

{¶34} Following deliberations, the jury found Stidhum guilty as charged. At the

10

sentencing hearing, the trial court merged the aggravated vehicular homicide with the vehicular homicide and imposed an aggregate sentence of 14 years' imprisonment, and a three-years-to-life license suspension. Stidhum then requested an indigency hearing. Stidhum stated that his family had hired his attorney, he had no savings or assets, he had no way to earn an income for the next 12 years, and he had nothing of value to sell. The court determined he was indigent by choice and imposed a maximum fine of $15,000 for the second-degree felony. The court informed him that community service would be available if he could not pay the fine.

### Identification Testimony

{¶35} In his first assignment of error, Stidhum argues that the trial court erred in allowing Crawford, Luebbers, and Weber to identify him in court because a first-time in-court identification is inherently suggestive and unreliable. He further argues that where identity is an issue, an in-court identification that is not preceded by a successful identification in a nonsuggestive procedure or prescreened by the trial court violates due process.

{¶36} Whether the Due Process Clause requires the suppression of an eyewitness identification involves a two-step inquiry. *See Perry v. New Hampshire*, 565 U.S. 228, 238, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012). First, the court must determine whether "law enforcement officers use[d] an identification procedure that is both suggestive and unnecessary." *Id.* If so, the court must determine whether under the " 'totality of the circumstances,' " *id.* at 239, quoting *Manson v. Brathwaite*, 432 U.S. 98, 110, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the identification was nonetheless "reliable," and admissible, even though the confrontation procedure was "unnecessarily suggestive." *Id.*, citing *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *State v. Neal*, 1st Dist. Hamilton No. C-140677, 2015-Ohio-4705, ¶ 28.

11

{¶37} In the second step, the court should focus on a number of factors in evaluating the witness's ability to make an accurate identification, which include (1) the witness's opportunity to view the defendant during the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the suspect, (4) the witness's certainty, and (5) the time elapsed between the crime and the identification. *Perry* at fn. 5.

{¶38} If there is no showing that the police employed an unduly suggestive and unnecessary procedure to obtain the identification, then the unreliability of the identification alone will not preclude its admission at trial. *Id.* at 238-239. Instead, such unreliability should be exposed through the rigors of cross-examination at trial and the protections built into the adversary system, such as the right to the effective assistance of counsel, the right to confront the witness, and the rules of evidence. *Id.* at 245-246; *see State v. Hogan*, 10th Dist. Franklin No. 11AP-644, 2012-Ohio-1421, ¶ 11. The undue-suggestiveness framework is not premised on the unreliability of evidence alone, but "turn[s] on the presence of state action and aim[s] to deter police from rigging identification procedures." *Perry* at 233.

{¶39} Here, Stidhum makes no showing that the state employed an unduly suggestive and unnecessary procedure. Instead, he requests that this court adopt a new rule of law and find that all first-time, in-court identifications are inherently suggestive and violate due process unless preceded by a successful identification in a nonsuggestive procedure or prescreened by the trial court. We decline to do so. "The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." *Id.* at 245.

{¶40} Accordingly, we overrule the first assignment of error.

12

**Ineffective Assistance of Counsel**

{¶41}  In his second assignment of error, Stidhum argues that his trial counsel was ineffective for failing to object to the in-court identifications, a witness's opinion that Stidhum was guilty, and irrelevant testimony about the DNA testing of a gun, and for eliciting damaging testimony.  He further contends that the cumulative effect of counsel's errors and omissions resulted in the denial of his right to the effective assistance of counsel.  We have already concluded that the in-court identifications were admissible, so the failure to object was not deficient.

{¶42}  To prevail on an ineffective-assistance-of-counsel claim, Stidhum must show that trial counsel's performance fell below an objective standard of reasonableness, and that he was prejudiced as a result.  *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  In order to demonstrate prejudice, Stidhum must establish that, but for counsel's errors, there is a reasonable probability that the result of trial would have been different.  *State v. Burke*, 97 Ohio St.3d 55, 2002-Ohio-5310, 776 N.E.2d 79, ¶ 6.  The failure to make an adequate showing on either prong is fatal to an ineffective-assistance-of-counsel claim.  *See Strickland* at 697.

{¶43} The scope of cross-examination is considered a trial strategy, and debatable trial tactics do not establish ineffective assistance.  *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101, citing *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 45.  Moreover, an appellate court " 'must not scrutinize trial counsel's strategic decision to engage, or not engage, in a particular line of questioning on cross-examination.' "  *State v. Dorsey*, 10th Dist. Franklin No. 04AP-737, 2005-Ohio-2334, ¶ 22, quoting *In re Brooks*, 10th Dist. Franklin Nos. 04AP-164, 04AP-202, 04AP-165 and 04AP-201, 2004-Ohio-3887, ¶ 40.

{¶44} Stidhum contends that his counsel was ineffective for failing to object when Luebbers offered an opinion regarding Stidhum's guilt. However, Luebbers did not offer an opinion on Stidhum's guilt. Luebbers was questioned regarding the basis for her in-court identification, and she testified that she believed the correct person was arrested "based on the detective work." This testimony undermined the reliability of her identification. Instead of objecting, counsel vigorously and thoroughly cross-examined Luebbers in an effort to further impeach her credibility. Trial counsel's decision to cross-examine the witness regarding the statements, rather than object, was a matter of defense strategy and trial tactics, and therefore, does not constitute ineffective assistance. *See id.*

{¶45} Next Stidhum claims that counsel was ineffective for eliciting damaging testimony from Toyeas regarding Johnson's identification of Stidhum as the driver of the car. Counsel questioned Toyeas on his decision to show a lineup to only five of the eyewitnesses. The moment Toyeas mentioned Johnson by name, counsel immediately interrupted him and objected, preventing Toyeas from answering the question. The state also objected, and the trial court determined that the testimony was admissible and allowed Toyeas to answer the question.

{¶46} Toyeas stated that he did not show a lineup to any additional witnesses because Homer had identified Stidhum with 75 percent confidence, and Johnson had identified Stidhum with 100 percent confidence. Counsel then elicited testimony from Toyeas that Johnson had retracted her initial statement. Because counsel objected to the response from Toyeas and effectively cross-examined the witness, we cannot conclude that counsel was ineffective.

{¶47} Stidhum next argues that his counsel was ineffective for failing to object to testimony regarding a DNA test of a gun. Sundermeier, the serologist who conducted

14

the DNA testing, testified that two swabs from a Taurus pistol were given to her for testing. She obtained a mixed DNA profile from the gun with one major contributor. Chatfield and Stidhum were excluded as donors of the major DNA profile. She could not compare the minor profiles because the sample was insufficient. Although the testimony was irrelevant, Stidhum has failed to demonstrate that, but for counsel's deficient performance, the result of the proceeding would have been different. Therefore, he has failed to meet his burden to show ineffective assistance of counsel. *See Strickland* 466 U.S. at 687-689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶48} We overrule the second assignment of error.

### Failure to Preserve Evidence

{¶49} Stidhum's third assignment of error contends that the destruction of the recordings of nine witnesses deprived him of his right to present a defense and his right to confront the witnesses. Stidhum argues that the recorded statements were material to his defense, and without the recorded statements, he could not effectively confront the witnesses against him.

{¶50} We first note that these constitutional arguments were not raised before the trial court. Although Stidhum filed a motion to dismiss based on the state's failure to provide Crawford's recorded statement and a motion to suppress her identification testimony, Stidhum did not raise these constitutional issues in his motions and assigned no error based on the trial court's rulings on those motions.

{¶51} Issues not raised in the trial court will be reviewed on appeal for plain error. *State v. Williams*, 79 Ohio St.3d 1, 12, 679 N.E.2d 646 (1997). "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. An appellant must demonstrate

15

that an error affected the outcome of the trial and must be corrected to prevent a manifest miscarriage of justice. *See State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22-23.

{¶52} Here, the tapes in question were recordings of witness statements made by Toyeas on the day of the accident. Toyeas listened to the recordings and transcribed written summaries of the statements that contained all of the pertinent information. He copied the recordings onto discs that he provided to the prosecution, but those discs could not be found. Although Toyeas believed that he had also copied the recordings onto his computer hard drive, the recordings could not be located on the computer by an IT specialist.

{¶53} Stidhum contends that the summary of the statements hampered his ability to effectively prepare his defense and cross-examine the witnesses, but he provides no basis for this assertion. He does not allege that critical facts were omitted from the statements prepared by Toyeas. After reviewing the record, we find the witnesses' testimony was consistent with the written summaries, and that even without the recorded statements, defense counsel effectively cross-examined the witnesses and challenged their credibility. Therefore, we cannot conclude that the absence of the recordings affected the outcome of the trial or caused a miscarriage of justice. *See id.* Stidhum was not deprived of his right to present a defense or his right to confront the witnesses, and we overrule the third assignment of error.

### Motion for Mistrial

{¶54} In his fourth assignment of error, Stidhum argues that the trial court erred in denying his request for a mistrial. Stidhum further argues that he was deprived of his right to a fair trial because the jury repeatedly heard inadmissible testimony regarding his prior criminal convictions.

16

{¶55} The granting or denial of a motion for a mistrial rests in the sound discretion of the trial court. *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 92, citing *Ohio v. Glover*, 35 Ohio St.3d 18, 19, 517 N.E.2d 900 (1988). The trial court need not declare a mistrial "unless the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991). The trial court is in the best position to determine whether the circumstances warrant the declaration of a mistrial. *Ahmed* at ¶ 92.

{¶56} Stidhum moved for a mistrial based on Peponis's testimony that he had previously arrested Stidhum for drug trafficking. When counsel objected, the trial court immediately instructed the jurors to disregard Peponis's remark. Stidhum's subsequent request for a mistrial was denied. Peponis later stated that he had participated in multiple investigations involving Stidhum, and the trial court admonished him again. Counsel did not renew the request for a mistrial. After Peponis's testimony ended, the trial court again instructed the jurors and told them to disregard Peponis's remarks.

{¶57} In light of the trial court's multiple curative instructions, the trial court's decision to deny motion for a mistrial was not an abuse of discretion. We presume that the jury followed the court's instructions, including instructions to disregard testimony. *State v. Loza*, 71 Ohio St.3d 61, 75, 641 N.E.2d 1082 (1994). Accordingly, we overrule the fourth assignment of error.

### Other-acts Evidence

{¶58} In his fifth assignment of error, Stidhum contends that the trial court erred by permitting the state to introduce evidence of a prior bad act. Specifically, Stidhum argues that the testimony establishing that, 15 days earlier, he had recklessly caused a car accident and had fled the scene was irrelevant and unduly prejudicial.

{¶59} A trial court's decision regarding the admissibility of other-acts evidence

17

is an evidentiary determination that is reviewed for an abuse of discretion. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, syllabus.

{¶60} Generally the prosecution may not present evidence that the defendant has committed other crimes or acts to prove a defendant's character as to criminal propensity. Evid.R. 404(B). Other-acts evidence of a certain modus operandi is admissible under Evid.R. 404(B) "because it provides a behavioral fingerprint which, when compared to the behavioral fingerprints associated with the crime in question, can be used to identify the defendant as the perpetrator." *State v. Lowe*, 69 Ohio St.3d 527, 531, 634 N.E.2d 616 (1994). But to be admitted for this purpose, evidence of other acts "must be related to and share common features with the crime in question." *Id.*

{¶61} When considering other-acts evidence, the Ohio Supreme Court has established a three-step analysis: "(1) Is the evidence relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence? (2) Is the evidence of the other crimes, wrongs, or acts presented to prove the character of the accused in order to show activity in conformity therewith or is it presented for a legitimate purpose, such as those stated in Evid.R. 404(B)? (3) Is the probative value of the other-acts evidence substantially outweighed by the danger of unfair prejudice?" *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 97, citing *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20.

{¶62} The state offered the testimony to prove Stidhum's identity as the driver of the car by establishing a behavioral fingerprint. In both instances, Stidhum was speeding, lost control of his vehicle, hit another vehicle, and fled on foot because his car was inoperable. The trial court concluded that those acts shared common features with the crime in question and had occurred 15 days prior.

18

{¶63} Stidhum argues that the probative value was substantially outweighed by the danger of unfair prejudice. We find that it was not on the present facts. The trial court's limiting instruction "minimized the likelihood of any undue prejudice regarding the jury's consideration of [the] testimony," *see State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 194, and we presume that the jury has followed the instructions given by the trial court. *Loza*, 71 Ohio St.3d 61 at 75, 641 N.E.2d 1082.

{¶64} We overrule the fifth assignment of error.

## Cumulative Error

{¶65} In his sixth assignment of error, Stidhum argues that the cumulative effect of all of the errors denied him his right to a fair trial.

{¶66} The doctrine of cumulative error allows a conviction to be reversed if the cumulative effect of errors, deemed separately harmless, deprived the defendant of his right to a fair trial. *See State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. "The doctrine of cumulative error is inapplicable where there are not multiple instances of harmless error." *State v. Leach*, 150 Ohio App.3d 567, 2002-Ohio-6654, 782 N.E.2d 631, ¶ 57 (1st Dist.).

{¶67} After reviewing the record and finding no errors, we cannot find cumulative error. Accordingly, we overrule the assignment of error.

## The Fine

{¶68} In his seventh assignment of error, Stidhum argues that the trial court erred in imposing a $15,000 fine because the court failed to consider his present and future ability to pay.

{¶69} We review the imposition of a fine to determine whether it is clearly and convincingly contrary to law. *See State v. Owens*, 1st Dist. Hamilton No. C-170413, 2018-Ohio-1853, ¶ 5; *State v. Thornton*, 2017-Ohio-4037, 91 N.E.3d 359, ¶ 12 (1st Dist.).

A sentencing court has the discretion to impose a fine of up to $15,000 for a felony of the second degree. R.C. 2929.18(A)(3)(b). Before a court may impose a financial sanction, R.C. 2929.19(B)(5) requires a court to consider "the offender's present and future ability to pay the amount of the sanction or fine." As long as the record contains some indication that the trial court considered the offender's present and future ability to pay the fine, the court's imposition of a financial sanction is not contrary to law. *State v. Collier*, 184 Ohio App.3d 247, 2009-Ohio-4652, 920 N.E.2d 416, ¶ 11 (10th Dist.).

{¶70} The record contains evidence that the trial court considered Stidhum's present and future ability to pay. The court held an indigency hearing and determined that Stidhum was indigent. But indigency alone does not preclude the imposition of a fine. *See State v. Gipson*, 80 Ohio St.3d 626, 687 N.E.2d 750 (1998) (determining that the defendant's indigency at the time of sentencing does not preclude a trial court from imposing a fine upon the defendant); *State v. Ficklin*, 8th Dist. Cuyahoga No. 99191, 2013-Ohio-3002, ¶ 13 (recognizing that " 'indigency' refers to a present financial ability and 'is unable to pay' encompasses a future ability to pay as well").

{¶71} The record contains no evidence that Stidhum would not be employable upon his release from prison. In the event that he is unable to pay the fine upon his release, the trial court specifically notified him that he could do community service in lieu of paying the fine.

{¶72} Based on this record, we find that the trial court considered Stidhum's present and future ability to pay a fine. Accordingly, we overrule the seventh assignment of error.

## Conclusion

{¶73} Having considered and overruled Stidhum's seven assignments of error, we affirm the judgment of the trial court.

Judgment affirmed.

**CUNNINGHAM, P.J.,** and **MILLER, J.,** concur.

Please note:

The court has recorded its own entry this date.

